# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
### (NEWARK VICINAGE)

|  |  |
|---|---|
| JEAN MICHEL MECHIN, | : |
| Plaintiff, | : CIVIL ACTION NO.: 07-5824(SDW/ES) |
| vs. | : |
| CARQUEST CORPORATION; CARQUEST PRODUCTS, INC.; TMC ENTERPRISES; VOLTEC INDUSTRIES; TASCO; BWP DISTRIBUTORS, INC.; and ABC CORPORATIONS 1-10 (said names presently unknown and fictitious), | : |
| Defendants. | : |

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

MAZIE SLATER KATZ & FREEMAN, LLC
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 228-9898
Attorneys for Plaintiff

On the Brief:
David A, Mazie, Esq.
Matthew R. Mendelsohn, Esq.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

LEGAL ARGUMENT ......................................................................................................................... 1

    A.  Summary Judgment Should be Granted
        Dismissing the Defense of Comparative Negligence ............................................................. 1

    B.  Summary Judgment Should be Granted on Design Defect ..................................................... 5

    C.  Plaintiff is Entitled to Summary Judgment on Proximate Cause ............................................. 8

CONCLUSION ................................................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                      **Page(s)**

Aly v. Federal Express, Inc., 2010 WL 3118528, at *3
(D.N.J. Aug. 5, 2010) .................................................................................................................. 14

Brown v. United States Stove Co., 98 N.J. 155 (1984) ........................................................... 8,14

Coffman v. Keene Corp., 133 N.J. 581 (1993) ............................................................................ 2

Crumb v. Black & Decker, 204 N.J. Super. 521 (App. Div. 1985) ............................................. 3

Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 595 (1993) ................................ 12

Freund v. Cellofilm Property, Inc. 87 N.J. 229 (1981) ............................................................... 8

Glendenning v. WGM Safety Corp., 795 F. Supp. 720 (D.N.J. 1992) ........................................ 4

Green v. Sterling Extruder Corp., 95 N.J. 263 (1984) ............................................................. 1,2

In Re Paoli R.R. Yard PCB Litigation 35 F.3d 717 (3d Cir. 1994) ............................................ 12

Johansen v. Makita, 128 N.J. 86 (1992) ...................................................................................... 4

Johnesee v. Stop & Shop Cos., 174 N.J. Super. 426 (App. Div. 1980) ..................................... 13

Johnson v. Navistar International, 2008 WL 2885190 (N.J. Super. App.
Div. July 29, 2008) .................................................................................................................. 4,13

Johnson v. Salem Corp. 97 N.J. 78 (1984) .................................................................................. 8

Jurado v. Western Gear Works, 131 N.J. 375 (1993) ............................................................ 13,15

Lyons v. Caterpillar, Inc., 2005 WL 3358068 at *4-*5 (N.J. Super. App.
Div. December 12, 2005) ............................................................................................................. 2

Montgomery Courts v. Microquote Corp., 320 F.3d 440 (3rd Cir. 2003) .................................. 12

Ramos v. Silent Hoist and Crane Co, 256 N.J. Super. 467 (App. Div. 1992) ............................. 1

Rappaport v. Nichols, 31 N.J. 188 (1959) ................................................................................... 8

Rivera vs. Westinghouse Elevator Co., 209 N.J. Super. 543 (App. Div. 1986) .......................... 3

Roberts v. Rich Foods, Inc., 139 N.J. 365 (1995) ....................................................................... 6

Skill v. Martinez, 91 F.R.D. 498 (D.N.J. 1981) ........................................................................ 13

Straley v. United States, 887 F. Supp. 728 (D.N.J. 1985) ......................................................... 3

State Farm Fire & Casualty Company v. Holmes Products 165 Fed. Appx. 182 (3d Cir. 2006) .................................................................................................. 12

Suter v. San Angelo Foundry & Machine Co., 81 N.J. 151 (1979) ......................................... 1,3,5

Tirrell v. Navistar Intern. Inc., 248 N.J. Super. 390 (App. Div. 1991) ....................................... 1

**Other**

N.J.S.A. 2A:58C-2 .................................................................................................................. 6

## **LEGAL ARGUMENT**

**A.     Summary Judgment Should be Granted Dismissing the Defense of Comparative Negligence**

In their opposition, the defendants ignore the dozens of cases from the past 30 years which have uniformly held that there can be no comparative negligence assigned to an employee who is injured by a defective product at his job.  This is the case regardless of whether or not the plaintiff's conduct may be viewed as negligent, careless or reckless.  Suter v. San Angelo Foundry & Machine Co., 81 N.J. 151 (1979); Green v. Sterling Extruder Corp., 95 N.J. 263, 271-73 (1984); Tirrell v. Navistar Intern. Inc., 248 N.J. Super. 390 (App. Div. 1991).

The defendants first argue that it is a fact issue for the jury as to whether or not Mechin "voluntarily and unreasonably encountered a known risk".  However, the defendants miss the point -- the standard of "voluntarily and unreasonably encountering a known risk" **only applies to non-workplace product liability lawsuits**. See, Ramos v. Silent Hoist and Crane Co, 256 N.J. Super. 467, 483 (App. Div. 1992). As made clear by the Court in Tirrell v. Navistar Intern., Inc., 248 N.J. Super. 390, 401-02 (App. Div. 1991):

> [The] second [issue], should a plaintiff continue to be absolved from a workplace injury when he voluntarily and unreasonably encounters a known risk?
>
> *     *     *
>
> A positive answer to the second issue would require us to reconsider the Suter rule, an action which the court has shunned since 1979.  We cannot disobey Suter's clear directive.

The court in Tirrell made clear that **even where** a worker has voluntarily and unreasonably encountered a known risk, Suter establishes that the worker cannot be comparatively negligent as a matter of law.  Id.

1

Defendants also spend much of their brief arguing that the Suter rule does not apply because Mechin had a "meaningful choice" in the context of his job.  Once again, the defendants have misstated the law.  As recently noted by the New Jersey Appellate Division:

> a court cannot use a finding of meaningful choice to deny a worker the Suter prohibition on contributory negligence when the worker is injured while performing a job task.

Lyons v. Caterpillar, Inc., 2005 WL 3358068 at *4-*5 (N.J. Super. App. Div. December 12, 2005).  A copy of the Lyons decision is attached as Exhibit "A" to the Certification of David A. Mazie ("Mazie Cert.")  filed herewith.  This is a reaffirmation of the New Jersey Supreme Court's directive in Suter which expressly rejects defendants' assertion that an employee such as Mechin has any meaningful choice:

> In our view an employee engaged at his assigned task on a plant machine, as in Bexiga, has no meaningful choice...we hold as a matter of policy that such an employee is not guilty of contributory negligence....the law does not accept the employee's ability to take care of himself as an adequate safeguard of interests which society seeks to protect.  Suter, 81 N.J. at 167.

Defendants argue that Mechin had a choice as to whether or not to use the light, or whether to come to the aid of his co-workers when the gasoline began to spill.  However, none of these options presented Mechin with any "meaningful choice":

> It is unreasonable to assume that an employee would leave his or her position once apprised of certain safety hazards when such hazards are not rectified by the employer.  Green, supra, 95 N.J. at 271, 471 A.2d 15 ("The practicalities of the workday world are such that in the vast majority of cases, the employee works 'as is' or he is without a job").  We have thus rejected the application of contributory negligence when an employee was injured in the workplace during an industrial accident while using an unsafe machine for its intended purposes.  Coffman v. Keene Corp., 133 N.J. 581, 605-606 (1993).

It is undisputed that Mechin was the "low man on the totem pole," and that his assigned task prior to the incident was to work in the bay next to the one where the accident occurred.  It is also undisputed that Mechin was instructed to assist his superior/co-employee, Willie McWalters, on a fuel pump

2

repair, and that he finished that task and went back to his assigned job in the next bay. When the gasoline began to spill, Mechin was alerted of the problem by the scream of another superior/co-employee, Gary Gainey. In direct response, Mechin ran over to the fuel tank to attempt to stop the spill. Even defendants concede that at all times Mechin was following the instructions of his superiors, and that he was injured while he was performing his assigned task. Given this undisputed fact, how can it be said that Mechin had a "meaningful choice"? In essence, the defendants are arguing that Mechin should have exercised a meaningful choice by ignoring the directives of his superiors.[1] However, the law simply does not impose an obligation on a worker to ignore superiors and it is exactly the reason why there is a per se rule that workers have no meaningful choice:

> The essence of the Suter rule is that the employee [by virtue of the employer/employee relationship] ha[s] no meaningful choice. He either work[s] at his assigned task or [is] subject to discipline or being labeled as a troublemaker. Crumb v. Black & Decker, 204 N.J. Super. 521, 527 (App. Div. 1985).

Finally, defendants argue that Mechin should have "known better" than to run to the aid of his co-worker when the gasoline began to spill, or that he should have refused to have assisted his superior in the draining of the gas tank while an incandescent light was in the vicinity. Aside from the fact that Mechin would have subjected himself to being labeled a "trouble maker", numerous courts have held that workers are under no such duty to ignore their superiors, or that they are somehow responsible for their own safety in a work environment. That is simply not the law. For example, in Straley v. United States, 887 F. Supp. 728 (D.N.J. 1985), the Honorable Dickinson Debevoise granted plaintiff's motion for summary judgment dismissing the defense of comparative negligence pursuant to the Suter doctrine in a case where a worker on a sanitation truck was injured

---

[1] The handful of cases cited by defendants are inapposite or misquoted. For example, defendants cite to Rivera vs. Westinghouse Elevator Co., 209 N.J. Super. 543 (App. Div. 1986), which is wholly distinguishable as the plaintiff in that case used the product in a ridiculous and unforeseeable manner -- he was injured while laying on top of the roof of an elevator, while making repairs. This was clearly not the regular use of the elevator, but rather a completely unforeseeable situation.

3

while standing on a rear riding step of the truck, directing the driver as he backed up. The defendant argued that the worker had the choice not to stand on the back of the truck, which raised an issue of comparative negligence to be decided by the jury. Judge Debevoise rejected that argument, and granted summary judgment in the worker's favor dismissing the defense of comparative negligence. In doing so, he made clear that comparative negligence is not a defense in workplace product liability cases:

> The bottom line is that Straley was using industrial machinery in the workplace. Allegations that he acted negligently in that activity, whether by encountering a known risk of the riding step or by improperly directing the garbage truck in reverse, are barred by N.J.S.A. 2A:58C-3(a). Id. at 724.

A similar conclusion was reached by the Honorable Clarkson S. Fisher in the case of Glendenning v. WGM Safety Corp., 795 F. Supp. 720 (D.N.J. 1992) where the defendants opposed the dismissal of their comparative negligence defense because a plaintiff in the workplace had a meaningful choice and that he could have used a ladder instead of climbing up a metal form, or he could have used a safety belt which could have prevented him from falling from the form. Judge Fisher rejected that argument, finding that the defendants were reading too much into the language of "meaningful choice" as contained in Suter. Judge Fisher went on to hold, as did Judge Debevoise, that summary judgment is appropriate dismissing the defense of comparative negligence where, as here, an employee is injured by a defective product in the context of his employment. Judge Fisher went on to comment on the fact that the issue of "meaningful choice" has been overblown by product manufacturers, and that the New Jersey Supreme Court has made clear that "[i]n determining a manufacturer's liability for an allegedly defective product, the inquiry should focus on the condition of the product, not the plaintiff's use of care in operating a product." Id. at 723 quoting from Johansen v. Makita, 128 N.J. 86, 95 (1992). The same conclusion was recently reached by the Appellate Division in Johnson v. Navistar International, 2008 WL 2885190 (N.J. Super. App. Div.

4

July 29, 2008) where the court dismissed the claim of comparative negligence in a case where a sanitation worker fell from a side step of a garbage truck that he was riding on (as opposed to riding in the truck). A copy of the <u>Johnson</u> decision is attached as Exhibit "B" to the Mazie Cert. The Court held:

> The Judge's reasoning that plaintiff was responsible for his own safety is contrary to the public policy set forth in <u>Suter</u> that an employee on the job has no meaningful choice to reject the equipment provided and is unable to take of himself. <u>Ibid</u>.
>
>                     \*    \*    \*
>
> Plaintiff's choice to ride on the side step was no more negligent or reckless than Suter's choice not to turn off the motor before reaching into the machine or to reach into the other side of the machine. <u>Id.</u> at \*8.

In sum, ever since the advent of <u>Suter</u> in 1979, New Jersey courts have been universal in their application of the doctrine that an employee injured at his workplace by a product cannot be, as a matter of law, comparatively negligent. That is the law in New Jersey, and it should be applied in this case to dismiss the defendants' defenses of comparative negligence.

**B.** **<u>Summary Judgment Should be Granted on Design Defect</u>**

Summary judgment should be granted on the issue of design defect because the product was safety tested by the defendants, and the results of those tests concluded that the product was only safe for residential or "general use", and not commercial use. All of the safety testing was contracted out to Underwriters Laboratories ("UL"). Since UL determined that the product was not safe for automotive repair garages, then that determination -- by the only entity which the defendants relied on for safety testing -- should be binding on the defendants as to whether the product is defective. This is no different than defendant's own employees testing the product and determining that it was not safe. In fact, Richard Egan, CPI's director of sales and marketing **testified that CPI never would have sold the Carquest Trouble Light to Firestone without a UL listing approving the light for use in commercial automotive repair garages**. (Egan Dep. at Exhibit "P" to Mendelsohn

5

Certif. at 31:14-32:14.) Accordingly, UL's position that the product was not safe -- nor approved -- for use in commercial automotive garages should be dispositive that the light is defectively designed if sold to an automotive repair shop, as it is not "reasonably fit, suitable and safe for its intended or reasonably foreseeable purpose." N.J.S.A. 2A:58C-2; Roberts v. Rich Foods, Inc., 139 N.J. 365, 376, 382 (1995).

Defendants argue that summary judgment should not be granted because UL representatives "contradicted one another" in their testimony. This is simply untrue. UL representatives testified that since the product was approved for "general-use," it was **NOT** appropriate for use in an automotive repair garage where there might be gasoline. Defendants' sole argument to rebut this testimony was to assert that UL representative John Herschbach was not knowledgeable about UL 355, the UL standard for cord reels that the Carquest light was evaluated under. However, defendants have utterly mischaracterized the testimony. Mr. Herschbach's testimony was that he does not know whether or not the product would have been approved for commercial use had it been tested for it. In other words, Mr. Herschbach simply did not have the knowledge to answer the question. Conveniently, defendants completely ignore the fact that Mr. Herschbach was not the most knowledgeable witness, but that UL designated David Gerstetter as a Rule 30 (B)(6) witness as the person with the most knowledge of the issue. Gerstetter testified that because the Carquest Trouble Light was only approved for "general-use," the defendants should not have included the UL listing mark on the product because a purchaser could be misled into believing that UL had tested and listed the product for use in a hazardous location, such as an automotive repair garage:

> Q. The question is this. If the product was in this instance approved only for general residential use but Carquest and its agents sold the product for commercial/industrial use for use above hazardous locations, they would not be authorized to put the UL mark on the product for that purpose?
>
> Q. Correct?

6

> A. It would be a misapplication of the product.
>
> Q. In this circumstance, the product, the Carquest product we are talking about, was only approved by UL for use in general residential environments, correct?
>
> A. Correct.
>
> Q. And if Carquest was selling this product primarily to automotive repair garages for use above hazardous locations, then they should not have included the UL mark on the product such that the purchaser would be misled into believing that UL had tested the product for that type of location, correct?
>
> A. I believe that's correct.
>
> Q. Okay. That would be a misapplication of this product, in other words using it in a commercial/industrial environment above a hazardous location?
>
> A. Correct.

(Gerstetter Dep. at Exhibit "M" of Mendelsohn Certif. at 74:13-76:1). Gerstetter further confirmed that the Carquest Profession-Duty Trouble Light was not appropriate or safe for use in a commercial automotive garage, and that UL never would have approved it for use in a hazardous location such as a Firestone facility where gasoline and other flammables are present because it would not comply with UL 355, which is the standard which governs whether the product is safe enough to be used in a commercial automotive repair shop where hazardous substances exist:

> Q. So we are clear, if this product which was submitted by or on behalf of TMC had been submitted to UL and UL was told the product was being submitted -- and when we say "product," the cord reel and hand lamp that was submitted by TMC on its behalf; if it was submitted for commercial/industrial use above a hazardous location, it would not have been found by UL to comply with UL 355, correct?
>
> A. Correct.

(Gerstetter Dep. at 54:19-18). In short, UL's position is crystal clear: the incandescent light was never approved for use in a commercial automotive garage, nor would it ever have been approved for such a use. This determination is binding on the defendants, as UL was the entity which the

7

defendants deferred to for testing of the safety of the product. Because the product was deemed not "reasonably fit, suitable and safe" for use in a commercial automotive garage, it is per se defectively designed for that use, and summary judgment is appropriate on design defect. N.J.S.A. 2A:58C-2

### C.     Plaintiff is Entitled to Summary Judgment on Proximate Cause

Voltec opposes plaintiff's motion for summary judgment on the issue of proximate cause because, it contends, there is a material issue of fact as to how the fire started.[2]   However, that is not the standard for deciding whether plaintiff prevails on proximate cause as a matter of law. Instead, plaintiff's burden is to prove that the drop light was a "**contributing causal factor** in the happening of the accident." (emphasis added)   Johnson v. Salem Corp. 97 N.J. 78, 95 (1984); Freund v. Cellofilm Property, Inc. 87 N.J. 229 (1981).  Proximate cause in a products liability case includes the notion of a concurrent cause when more than one act contributes to the accident harm.  Brown v. United States Stove Co., 98 N.J. 155, 171 (1984). This means that a defendant will be liable for all damages if its defective product was a substantial factor in causing the injuries even where there are "other intervening causes which were foreseeable or normal incidents of the risks created." Id. at 171 quoting from Rappaport v. Nichols, 31 N.J. 188 (1959).

The defendants baldly assert -- in complete contradiction of all available evidence -- that the light could not have possibly caused the fire because there is no proof that a bulb was screwed into the drop light when it fell into and ignited the gasoline.  This preposterous position is belied by all of the evidence in the record which confirms that the bulb was screwed into the defendant's product and was lit immediately before the fire.  For example, the Morris County Prosecutor's Office Arson Unit examined the scene of the fire and observed:

> The examination of the drop light, which was located on the floor of the garage in Bay Seven, revealed that it had a black colored handle with solid

---

[2] The other defendants also oppose summary judgment on proximate cause. However, neither defendant offers any evidence to demonstrate that the fire was caused by anything other than the drop light. Thus, these arguments should be rejected out of hand.

8

metal back and hinged front metal cage that opened to insert a light bulb. Further examination of the drop light revealed damage to the metal cage indicative of an object landing on top of the drop light. **The remnants of a light bulb, the filament and standard E26 Edison Screw Base were still in the seat of the drop light.** (emphasis added)

(See Morris County Prosecutor's Office Arson Unit Report at Exhibit "T" to Mendelsohn Certif.) For Voltec's experts to actually take the position that there was no bulb in the light is a complete fabrication. This issue begins and ends with the pictures of the drop light taken during OSHA's investigation which **clearly demonstrate** the presence of a broken bulb within the drop light housing. Specifically, the stem of the bulb, support wires for the tungsten filament, and jagged edges of the glass bulb are all clearly visible.



Jagged remnants of glass bulb

Light bulb "Stem" which contains multiple parts including the glass pinch, fuse and exhaust tube.

"Support Wires" for Tungsten Filament

See Pictures produced by OSHA at OSHA00404-406 attached to Mazie Certif. at Exhibit "C."

9

Moreover, the testimony of the eyewitnesses also confirms that a bulb was present in the droplight at the time of the fire and that the light was turned on at the time the fire started. David Jaros, an eyewitness testified as follows:

> Q. Do you have any recollection, as you sit here today, as to whether the drop light was on at that time or was it off?
>
> A. The drop light was on.
>
> Q. Do you have a recollection as you sit here today, as to how it was knocked to the floor?
>
> A. No.
>
> Q. Did you see the drop light on the floor prior to the fire?
>
> A. Yes.
>
> Q. Was it still on?
>
> A. Yes.

(Jaros Dep. at Exhibit "D" to Mazie Certif. at 48:9-49:3). Another eyewitness, Gary Gainey similarly testified that the fuel tank fell to the ground and landed on top of the Carquest Trouble Light, crushing it and causing the Carquest Trouble Light to ignite the fuel:

> Q. Did you see the fire ignite, the fire that JM was involved in?
>
> A. Yes, once it hit the light, everything went up quick.
>
> Q. And did you see what caused the gasoline to ignite?
>
> A. From the – looked as if the tank hit the light, that's what ignited it.
>
> Q. So you saw the fire ignite from the light and spread out from there?
>
> A. I saw the tank hit the light and everything went up.

(Gainey Dep. at Exhibit "E" to Mazie Certif. at 181:13-182:17).

Consistent with the testimony of every eyewitness to the accident, every investigating authority also came to the conclusion that the Carquest Trouble Light ignited the gasoline and caused

10

the fire. The Denville Fire Department's Fire Prevention Bureau responded to the scene of the fire and conducted an investigation. They concluded: "It is the opinion of this office that the fire was accidental in nature due to the unstable nature of the gas tank being drained from the cart, falling to the ground, and gas flowing across the floor coming in contact with the droplight." (See Denville Fire Department Report at Exhibit "S" to Mendelsohn Certif.) The Morris County Prosecutor's Office Arson Unit also investigated the fire and concluded:

> Based upon statements of witnesses, the scene examination and the experience of the undersigned, it is the opinion of the undersigned that this fire originated in Bay Seven, of a ten bay garage. The first material ignited was the gasoline vapors created when gasoline began to spill out of a thirty five to forty gallon gasoline tank. **The source of the heat energy for the ignition of the gasoline vapors is the drop light that was being utilized by the victim during the gasoline transfer.** There are no indications, at this time, that the fire was intentionally set." (emphasis added) (See Morris County Pros. Office Arson Unit Report at Exhibit "T" to Mendelsohn Certif.)

The Occupational Safety and Health Administration ("OSHA") also conducted a full investigation about the accident and concluded: "On or about 7/3/07, employees were exposed to burns from the ignition of gasoline vapor while transferring gasoline from a vehicle fuel tank to a container located on a makeshift stand when an unapproved drop light fell into spilled gasoline." (See OSHA Report at Exhibit "U" to Mendelsohn Certif.)**.**

Despite this overwhelming evidence, Voltec tries to defeat summary judgment by offering opinions from two experts that the cause of the fire is "undetermined," and that the heat from the light is a very unlikely cause of the accident. (Voltec Br. at p. 7). Specifically, Voltec's experts contend that it is practically impossible for the light to have ignited the gasoline or its vapors because there was no proof that the bulb was on, or even in the light at the time of the incident. However, as discussed above, the opinions of Voltec's experts are completely contradicted by all of the evidence and testimony in the record. One thing is certain, a lit bulb was in the light at the time of the incident. Because the experts' opinions are not based on any facts or science, they should be rejected as

11

inadmissible "net opinions." The admissibility of expert testimony is governed by Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 595 (1993); In Re Paoli R.R. Yard PCB Litigation 35 F.3d 717, 742 (3d Cir. 1994); Fed. R. Evid. 702.  The court is charged with the role as "gatekeeper" to prevent any expert testimony from reaching the jury which is based on facts or scientific methodologies that are not reliable. See Daubert, 509 U.S. at 592-93.  See also Montgomery Courts v. Microquote Corp., 320 F.3d 440, 448 (3rd Cir. 2003) (where the facts underlying an "expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded.")  The Third Circuit addressed this issue in State Farm Fire & Casualty Company v. Holmes Products 165 Fed. Appx. 182 (3d Cir. 2006) where, like the within matter, the plaintiff alleged that a fire was caused by a lamp. Plaintiff's sole support to prove causation was its expert's opinion. However, the court struck plaintiff's expert pursuant to Daubert and then entered summary judgment in defendant's favor.  In affirming the striking of plaintiff's expert report, the Third Circuit stated:

> In interpreting Daubert, this court has stated "that the language of Rule 702 requiring the expert to testify to scientific knowledge must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation." 165 Fed. Appx. at 186 citing In Re Paoli R.R. Yard PCB Litig., 35 F. 3d at 742.

The court found that the expert's testimony as to the cause of the fire "was not supported by any scientific analysis or methodology; it was merely unsupported speculation and was therefore properly excluded." State Farm, 165 Fed. Appx. at 186. The court concluded that without the expert's testimony, plaintiff could not create a material issue of fact regarding causation, and summary judgment was properly granted. Id. at 187.

Similarly here, the defense experts' opinions on causation constitute inadmissible net opinions which cannot defeat summary judgment. Neither of Voltec's experts offer any opinion as to the cause of the fire. Although they state that there are other "possible" causes of the fire, neither

12

of them opine as to any "probable" cause. In fact they both take the position that the cause of the fire is "unknown and unknowable." (Voltec's Br. at p. 7). Because scientific expert opinion must be given within a reasonable degree of probability, the opinions of Voltec's experts do not rise to the level of admissible expert opinion. Skill v. Martinez, 91 F.R.D. 498, 512-513 (D.N.J. 1981) (expert opinions "must be couched in terms of reasonable medical certainty or probability; opinions as to possibility are inadmissible.") citing Johnesee v. Stop & Shop Cos., 174 N.J. Super. 426, 431 (App. Div. 1980). In short, merely opining that the cause of the fire is "unknowable" -- especially when all of the evidence in the record definitively establishes that the lit bulb caused the fire -- is an inadmissible net opinion which cannot defeat entry of summary judgment on proximate cause.

Finally, defendants miss the entire point of proximate cause by arguing that Mechin and/or his employer "misused the product" by using it to assist in a fuel tank repair.[3] But that is the exact point of the defect -- that an incandescent light should never be sold to a commercial automotive repair facility like Firestone. Plaintiff need only establish that the defective light was a "contributing causal factor in the happening of the accident." Johnson v. Salem Corp. 97 N.J. 78, 95 (1984). Accordingly, if the light is never sold to Firestone, the accident never happens. And, as discussed in plaintiff's moving brief, even assuming arguendo, that Mechin and/or his co-employees "misused" the light by using it in conjunction with a fuel pump repair, summary judgment is still appropriate on the issue of proximate cause. This is because the defendants have a duty to prevent an injury which is caused by any **foreseeable misuse** of its product. Jurado v. Western Gear Works, 131 N.J. 375, 388 (1993). "In applying strict liability in tort for design defects, manufacturers cannot escape liability on grounds of misuse or abnormal use if the actual use proximate to injury was *objectively*

---

[3] Defendant Carquest also contends that Mechin continued to use the drop light after being directed to remove it from the work area by Frank Stefanak. (See Carquest Br. at p. 26). However, this is another misrepresentation of the record. As defendants are well aware, Mr. Stefanak testified under oath that he **never** directed Mechin to move the light. (Stefanak Dep. attached as Exhibit "F" to Mazie Certif. at 107:1-7). Thus, this entire argument should be rejected out of hand.

13

*foreseeable*". Brown v. United States Stove Co., 98 N.J. 155, 166 (1984); Aly v. Federal Express, Inc., 2010 WL 3118528, at *3 (D.N.J. Aug. 5, 2010) ( it would be "illogical to negate [defendant's] liability based on the very misuse it had a duty to protect against."). A copy of the Aly decision is attached as Exhibit "G" to the Mazie Certif. Where a product is defective solely because of a manufacturer's failure to protect against that foreseeable misuse, "the issue of proximate cause is **predetermined.**" Jurado, 131 N.J. at 388 (emphasis added). There is no issue of foreseeability here. The defendants clearly testified that they fully intended to market and sell the product to commercial automotive repair garages, and that they were aware that fuels and other flammable vapors were present in those garages. (See, Miller Dep. at Exhibit "I" to Mendelsohn Certif. at 50:22-51:1; Ginsburg Dep. at Exhibit "N" to Mendelsohn Certif. at 11:5-25, 24:22-25:15, 26:16-27:16; Lewis Dep. . at Exhibit "O" to Mendelsohn Certif. at 106:3-13; Egan Dep. at Exhibit "P" to Mendelsohn Certif. at 31:14-32:14; Pallai Dep. at Exhibit "J" to Mendelsohn Certif. at 34:13-23). Accordingly, every defendant was on notice that this light would be used around flammable liquids such a gasoline and other petroleum products. Thomas Miller, who is a principal and the President of defendants TMC Enterprises, Tasco and Voltec conceded that he knew there was a danger associated with the use of the trouble light around flammable liquids:

> Q. Do you know why the trouble light should not be used around flammable liquids?
>
> A. Because, from my knowledge, sir, they'll get hot.
>
> Q. And what would that mean? What's the danger of that if the trouble light gets hot around flammable liquids?
>
> A. Anything hot around flammable liquid can be dangerous.
>
> Q. Can cause a fire, correct?
>
> A. Yes.

(Miller Dep. at Exhibit "H" to Mazie Certif. at 104:8-18).

14

Similarly, Richard Egan, the Director of Marketing and Sales for Carquest Products, Inc. admitted that Carquest was aware of sale of the product to automotive repair garages would create a risk of fire due to the presence of flammable liquids:

> Q. Okay. Can you can you answer my question? My Question is, are you aware of any dangers associated with the use of an incandescent drop light in an automotive repair garage?
>
> A. Well, I'm aware that there can be danger whether it's used in an automotive repair garage or wherever if there's flammable fluid and an incandescent light were to break.

(Egan Dep. at Exhibit "I" to Mazie Certif. at 24:3-11). Clearly, there is no dispute that the defendants were acutely aware that by selling the incandescent light to Firestone and other automotive repair shops, they were exposing the product user to a risk of fire because of the existence of gasoline and other flammable fluids and vapors. Because this danger was clearly foreseeable, the issue of proximate cause is predetermined, and summary judgment is appropriate. Jurado, 131 N.J. at 388.

## CONCLUSION

For all of the foregoing reasons, plaintiff's motion for summary judgment should be granted.

MAZIE SLATER KATZ & FREEMAN, LLC<br>
Attorneys for Plaintiff<br><br>
By:_____<br>
DAVID A. MAZIE

Dated:  December 20, 2010
(H:\DAM\Mechin\Brief - reply - SJ  12-13-10)

15