UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(NEWARK VICINAGE)

-----------------------------------------------------------------x

JEAN MICHEL MECHIN,

                    Plaintiff,                        **Civil Action No.:  07-5824 (SDW)(ES)**

          -against-

CARQUEST CORPORATION; CARQUEST
PRODUCTS, INC.; TMC ENTERPRISES; VOLTEC
INDUSTRIES; TASCO; BWP DISTRIBUTORS,
INC.; and ABC CORPORATIONS 1-10 (said names
presently unknown and fictitious),

                   Defendants.

-----------------------------------------------------------------x

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO PRECLUDE THE
TESTIMONY OF PLAINTIFF'S EXPERTS**

HAWORTH COLEMAN & GERSTMAN,
LLC
45 Broadway, 21st Floor
New York, New York 10006
(212) 952-1103
Attorneys for Defendant
Voltec Industries, LLC

MINTZER, SAROWITZ, ZERIS, LEDVA
& MEYERS, LLP
2070 Springdale Rd., Suite 400
Cherry Hill, New Jersey 08003
(856) 616-0700
Attorneys for Defendants
Carquest Corp., Carquest Products, Inc. and
BWP Distributors, Inc.

LITCHFIELD CAVO LLP
An Illinois Limited Liability Partnership
1800 Chapel Avenue West, Suite 360
Cherry Hill, New Jersey 08002
(856) 854-3636
Attorneys for Defendants
Tasco and TMC Enterprises

# TABLE OF CONTENTS

ARGUMENT ............................................................................................................... 1

DEFENDANTS' MOTION TO PRECLUDE PLAINTIFF'S EXPERTS SHOULD BE
GRANTED ................................................................................................................. 1

POINT I

PLAINTIFF'S EXPERT ROBERT MALANGA'S TESTING AND CAUSATION
OPINION SHOULD BE EXCLUDED AS IRRELEVANT, NOT FITTING THE FACTS
AND UNRELIABLE ..................................................................................................... 1

    A. Exterior Bulb Surface Ignition Tests .......................................................... 2

    B. Physical Shock Resistance Tests ................................................................. 3

    C. Fuel Tank Fall/Crush Test ............................................................................ 5

    D. Hot Incandescent Filament, Fluorescent Tube Cathode Ignition and Gasoline Vapor
       Ignition Tests .............................................................................................. 6

    E. Fuel Tank Scrape Ignition Test .................................................................... 6

    F. Malanga's Causation Opinion is Based on Unreliable Methodology ............ 7

POINT II

PLAINTIFF'S EXPERT, JOHN TOBIAS, Ph.D., P.E. SHOULD BE PRECLUDED FROM
TESTIFYING .............................................................................................................. 11

POINT III

PLAINTIFF'S WARNINGS EXPERT SAM GLUCKSBERG SHOULD BE PRECLUDED
FROM TESTIFYING ................................................................................................... 13

i

# TABLE OF AUTHORITIES

**Cases**

Dennis v. Pertec Computer Corp.,
927 F. Supp. 156 (D. N.J. 1996), aff'd 135 F.3d 764 (3d Cir. 1997) ..................................... 14, 15


**Statutes**

Fed. R. Evid. 401 ...................................................................................................2
Fed. R. Evid. 402 ...................................................................................................2
Fed. R. Evid. 403 ...................................................................................................2


**Regulations**

NFPA 921 ...............................................................................................................7
United States NEC Article 511 .............................................................................15

**ARGUMENT**
**DEFENDANTS' MOTION TO PRECLUDE PLAINTIFF'S**
**EXPERTS SHOULD BE GRANTED**

Defendants filed a joint motion to preclude the testimony of plaintiff's experts, Robert Malanga, P.E. (cause and origin), John Tobias, Ph.D. (warnings, marketing and cause and origin) and Sam Glucksberg, Ph.D. (warnings).  The motion should be granted because:

- Malanga's testing is irrelevant and/or unreliable and will provide no assistance to the trier of fact;

- Malanga's methodology in ruling out alternative sources of ignition is unreliable;

- Tobias is in essence a cause and origin expert whose opinion is cumulative;

- To the extent he is proferred as an expert in warnings, Tobias lacks sufficient expertise in warnings and marketing to offer reliable testimony on these topics;

- Glucksberg lacks sufficient expertise to reliably opine on the adequacy of the warnings and marketing of the subject product.

**POINT I**
**PLAINTIFF'S EXPERT ROBERT MALANGA'S TESTING AND**
**CAUSATION OPINION SHOULD BE EXCLUDED**
**AS IRRELEVANT, NOT FITTING THE FACTS AND UNRELIABLE**

In his opposition, plaintiff argues that Malanga's tests, videos and photographs will assist the jury and are based on "accepted scientific principles and methodologies."  (See Plt. Brief, p. 5-6.)  Plaintiff misses the point.  The issue is not

1

solely whether Malanga's tests are based on generally-accepted scientific principles, which they are not, but also whether they have any relevance to the issues of the case. See Fed. R. Evid. 401 and 402.

Malanga's tests should be excluded because they are irrelevant, based on unreliable methodology, or both. (See p. 5-14 of Defendants' Daubert Brief.) Moreover, given the number of irrelevant destructive tests conducted by Malanga, it seems his true goal is, not to address an issue in dispute, but rather to bombard the jury with as many images as possible of the drop light falling, being crushed, catching fire and causing ignition of flammable liquids. Since many of these tests are irrelevant to Malanga's opinion or otherwise not addressed to an issue in dispute, they should be precluded because their prejudice outweighs their probative value. See Fed. R. Evid. 403.

## A.  **Exterior Bulb Surface Ignition Tests**

Malanga's exterior bulb surface ignition competence tests measured the maximum temperature reached by three grades of incandescent "rough service" bulbs. The purpose of the analysis was to determine whether the surface temperature of an incandescent bulb gets hot enough to ignite gasoline. Plaintiff argues that the tests are relevant because David Jaros, one of the eyewitnesses, testified to seeing gasoline spill from the fuel tank, run across the garage floor and come into contact with a lit drop light. (See Plt. Brief, p. 6-7.)  Plaintiff states that, if Jaros is to be believed, an

2

unbroken bulb caused the fire and therefore Malanga had to test the theory to confirm whether or not the fire could have happened in that manner.  (See Id.)

The tests should be excluded.  Since plaintiff's causation theory is that the exposed filament of a *broken* bulb caused ignition, there is no relevance to a test evaluating the potential for an *intact* bulb to cause ignition of flammable vapors[1]. Moreover, the tests do not address an issue in dispute because defendants have not contested the point that an intact, incandescent bulb will ***not*** generate enough heat to ignite gasoline.  Finally, plaintiff draws the wrong conclusion – one specifically disproven by his own expert – about Jaros' testimony i.e. "if Jaros is right, an unbroken bulb caused the fire."  (See Plt. Brief at 6-7.)  The accurate conclusion is that, if Jaros is right and the bulb did not break, then one of the several alternative ignition sources identified by the defense caused the fire.

**B.    Physical Shock Resistance Tests**

Malanga's physical shock resistance tests measured the ability of various hand lamp, cage and bulb configurations to withstand the physical shock of being dropped from various heights.  Plaintiff argues that these tests should be admitted because they "verify that the bulb could break if it was dropped."  (See Plt. Brief at 7.)

There is no purpose in showing these tests to the jury because it is uncontested that an incandescent bulb may break if dropped from a sufficient height.  Moreover,

---

[1] The tests showed that a lit, intact incandescent bulb does not generate sufficient heat to ignite gasoline.

the tests should be excluded because they are not reasonably tied to the facts of the case. Plaintiff misrepresents the testimony in arguing that "all witnesses agree that the light fell from a height between 4 and 8 feet." (See Plt. Brief at 8.) In fact, while certain witnesses may recall seeing the light hanging from the underside of the van or the metal stand that was holding the draining fuel tank, none of the witnesses could recall exactly how the drop light ended up on the floor. David Jaros testified:

> Q. Do you have any recollection, as you sit here today, as to how it was knocked to the floor?
>
> A. No.
> (See Jaros Dep. at 48:21-24, Ex. P to Haworth SJ Cert.)

Frank Stefanak, the Service Manager, testified that he could not recall where the drop light was after the fire started:

> Q. Okay. But I thought you previously testified that you didn't recall seeing the light on the floor. Does this refresh your recollection?
>
> A. I remember seeing the light, but I don't remember seeing it on the floor.
> (See Stefanak Dep. at 141:19-25, Ex.Q to Haworth SJ Cert.)

Another eyewitness, William McWalters testified:

> Q. You didn't know one way or another that the drop light had fallen on the floor, correct?
>
> A. No.
> (See McWalters Dep., 200:4-6, Ex. B to Haworth SJ Cert.)

Thus, the physical shock resistance tests do not pertain to an issue in dispute and given the lack of evidence of how the drop light ended up on the floor

4

including the force, height and angle at which it fell, the tests are in any event, unreliable.

**C.    Fuel Tank Fall/Crush Tests**

Plaintiff argues that the Fuel Tank Fall/Crush tests should be admitted because they "confirmed Mr. Malanga's opinion that the falling fuel tank would have broken the bulb and exposed the filament (thus resulting in the filament igniting the gasoline vapors.)" (See Plt. Brief at 9.) Similar to his physical shock resistance tests, Malanga arbitrarily selected a height of three feet and four feet and from straight and 45 degree angles to drop the tank. Plaintiff argues that the arbitrary selection of height and angle is scientifically permissible because Malanga "sought to be as conservative as possible."

The tests are not relevant to any triable issue. It is uncontested that a fuel tank dropped from a height can break an incandescent bulb. Showing a test demonstrating this uncontested fact would be of no assistance to the jury. Moreover, because there is no definitive evidence about the height or angle at which the tank fell, or the force exerted on the tank when it fell, Malanga's arbitrary choice of the height, angle and force, even if chosen conservatively as he claims, makes the tests inherently unreliable and misleading.

5

**D.     Hot Incandescent Filament, Fluorescent Tube Cathode Ignition and
         Gasoline Vapor Ignition Tests**

Malanga's ignition testing involved exposing several incandescent filaments and fluorescent tube cathodes to gasoline in liquid, mist, and vapor forms.   He concluded that ignition occurred in every case.  The tests are irrelevant because no one disputes that an energized incandescent filament or an energized fluorescent cathode tube has the potential to ignite flammable vapors.  Plaintiff's opposition does not contest this point but rather argues the tests should be admitted because his expert may have been criticized had he not performed the tests.   It is respectfully submitted that preemptive trial strategy does not make an irrelevant test suddenly relevant.  Since the tests do not address an issue in dispute, they are of no assistance to the jury and should be excluded.

**E.     Fuel Tank Scrape Ignition Test**

In a far-fetched effort to rule out a mechanical spark from the falling steel fuel tank striking the garage floor as an ignition source, Malanga performed yet another unreliable test by simply scraping an exemplar fuel tank against the floor of his garage where he sprayed an unknown albeit seemingly *de minimus* quantity of fuel. Plaintiff's opposition fails to address the test's critical weakness i.e. that it is unreliable because the force, height and angle at which the subject fuel tank struck the floor is unknown, exactly how much gasoline was in the tank at the time it fell is

unknown and the amount of flammable vapors that were present at the time of ignition is unknown.

Plaintiff argument that defendants cannot criticize Malanga's testing because "they performed absolutely no testing of their own" is simply wrong. (See Plt. Brief at 12.) In any event, even if it were true, it does not provide grounds for admitting the tests. Notably, Voltec's automotive expert, C. Bruce Gambardella, P.E., performed numerous tests as outlined in his expert report, photographs and video of which are in plaintiff's possession. Plaintiff has not moved to preclude any of Gambardella's testing.

**F.**    **Malanga's Causation Opinion Is Based On Unreliable Methodology**

Experts for both the plaintiff and the defendants agree that NFPA 921 is the standard for fire and explosion investigations. (See Malanga Dep. at 64:2-9 at Ex. C to Haworth Daubert Cert.) NFPA 921 provides that if there are equally "possible" ignition sources for a fire but no "probable" ignition source, the cause of the fire must be declared "undetermined." Here, Malanga's causation opinion should be excluded because, without any reliable basis, he rules out alternative, competent ignition sources that conflict with his opinion that the drop light caused the fire. This is a violation of proper methodology under NFPA 921. Malanga in fact testified that under NFPA 921 it is not proper to "discard something because you don't like what they said." (See Malanga Dep. at 65:16-66:9.)

Voltec's cause and origin expert, Donald Hoffmann, Ph.D., P.E., C.F.I., addressed alternative sources of ignition at his deposition:

> Q. Okay. And can you tell us what the possible ignition sources were, in your opinion?
>
> A. There was, in my evaluation, a number of ignition sources that were present at the scene. Certainly one of them would be the portable drop light. There would be mechanical ignition sources, such as impact of the casters on the concrete floor, the casters of the stand that was present. There was also impact of the steel gas tank on the ground due to its falling off of the stand, its precarious position. It fell off the stand, poured gasoline, hit the ground. There is also, and there's evidence of tools in the area. I don't know exactly what they were, but they certainly were in the photographs. I don't know where they were, but some action with regards to those tools falling or hitting the ground of some nature. There's also unrated electrical equipment, just like the drop light. There is other unrated electrical equipment that was in the garage and adjacent to the area where the gasoline was being spilled, And then, of course, when you improperly dispense gasoline from plastic containers and insulated materials, you can have a static build up. You can also have static discharge between a person and a static build up. So, I cannot eliminate the static discharge. I think those are all the potential possible ignition sources that I examined and couldn't determine which one was more likely than the others.
> (See Hoffmann Dep. at 30:2-31:7, Ex. D to Haworth Daubert Cert.)

Hoffmann's identification of alternative ignition sources and the inability to determine the probable ignition source of the subject fire is consistent with the conclusions reached by experts retained by Carquest and TMC Enterprises. (See Winter Dep., 81:1-3; 81:12-25 at Ex. H to Haworth Daubert Opp. Cert.; Ibaretta Dep., 65:15-66:5 at Ex. G to Haworth Daubert Opp. Cert.)

8

Notably, Malanga also agrees that the alternative ignition sources identified by Hoffmann are "theoretically possible," yet he attempts to rule these out via the above-described unreliable testing. (See Malanga Report, p. 46-48 at Ex. A to Haworth Daubert Cert.) Plaintiff's second cause and origin expert, John Tobias, Ph.D., also agreed that several of the potential ignition sources identified by Dr. Hoffmann, including metal on metal contact and static discharge, while in his view unlikely, could have ignited the vapors from the spilling fuel. (See Tobias Dep. at 62:8-16; 67:4-72:24, Ex. K to Haworth Daubert Opp Cert.) Yet, both Tobias and Malanga failed to perform any tests to rule out a spark from the metal stand or from static electricity. Malanga's reason for not evaluating a potential spark from the stand is the lack of eyewitness testimony specifically describing that the metal stand moved. However, when asked at deposition if he found scratch marks on the bottom of the metal casters on the stand, he answered that he did. (See Malanga Dep. at 208:11-18, Ex. C to Haworth Daubert Cert.)

Malanga's reliance on the conclusions of the investigating authorities is also misplaced. As outlined in defendants' summary judgment motions and in their opposition to plaintiff's summary judgment motion, the recorded statements taken from several employees at Denville Firestone by the official investigators do not establish the drop light as the cause of the fire or, at best for the plaintiff, are vague and subject to conflicting interpretation concerning the cause of the fire. The

"official" reports are also of questionable value as they present different, mutually exclusive, scenarios of how the fire occurred.  For example, OSHA investigated the fire and cited Denville Firestone for not providing proper training and fuel handling equipment and allowing non-rated electrical equipment i.e. the drop light to be used near open containers of fuel.  (See OSHA violations at Ex. S to Haworth SJ Cert.) The OSHA report states that "an unapproved drop light fell into spilled gasoline." (See Id.)  However, Malanga performed a test showing that, an energized and intact bulb, **dropped in gasoline** would **not** create sufficient heat to ignite gasoline. Therefore, (i) OSHA and plaintiff's expert are at odds with one another; and (ii) if OSHA's factual scenario is accurate it actually discounts the possibility that the droplight was the ignition source.  Further, the "official" reports do not demonstrate causation as a matter of law because there is no evidence that the investigating authorities, in their limited time on the scene, conducted a complete and thorough cause and origin investigation to rule out all possible ignition sources.  Hoffman properly pointed out that the official authorities "**did not evaluate other potential ignition sources in their report.**" (See Hoffmann Dep., p. 26:21-27:2, Ex. BB to Haworth SJ Cert.)  Plaintiff fails to dispute the inadequacy of the official investigation in terms of identifying the source of ignition.

Based on the foregoing, Malanga's causation opinion should be excluded because it was not based on reliable methodology to rule out alternative, sources of ignition other than the drop light.

## POINT II
## PLAINTIFF'S EXPERT, JOHN TOBIAS, PH.D., P.E. SHOULD BE PRECLUDED FROM TESTIFYING

Plaintiff's brief clarifies exactly why he is offering Dr. Tobias as an expert in this matter. As can be seen, in Plaintiff's Brief, p. 4 and p. 17, Tobias is an electrical engineer with an expertise in "**malfunction** in electrical devices which lead to fire…" However, both Tobias' opinion and the plaintiff's argument are that the gas tank fell from the stand and crushed the product in question, thereby breaking the bulb and exposing the hot filament to gasoline vapors. Therefore, this case does not involve a "malfunction of an electrical device." Moreover, Tobias' testimony and his two reports say nothing about a malfunction of the product.

Plaintiff's brief contends that Malanga's testing supports Tobias' opinion. That does not refute the fact that Tobias is nothing more than a cumulative expert who relied upon the faulty testing of another expert. Since there is no malfunction, and Tobias relies upon questionable testing by another plaintiff expert, his testimony as to malfunctions "in electrical devices that can lead to fire…" adds nothing that would assist the jury in determining how the accident occurred and whether any party was responsible.

Plaintiff's brief has also refined his position that the defect in the product is that it contained a filament that when the bulb was energized, it got extremely hot and upon breaking of the bulb, was likely to ignite gasoline vapors.  If that is indeed now plaintiff's theory, then two of Tobias' three opinions which he initially set forth are no longer viable (the hot intact bulb as a possible ignition source and an arc when the bulb broke exposing the filament).  A malfunction expert may be relevant if during use the product somehow "malfunctioned" leading to an injury.  There is nothing in the record which would lead a jury to believe that the product in question had malfunctioned or was otherwise "crush-proof."  Now that the plaintiff's counsel has clarified that Mr. Tobias is being offered as a "malfunction expert" it is clear that his opinion has no relevance to the case and should therefore be excluded.

Further, to the extent plaintiff intends to call Tobias on warnings and/or marketing, as outlined in defendants moving papers, he has no relevant experience in this regard and should therefore be precluded.

Based on the foregoing, and based on the arguments and evidence set forth in defendants' moving brief, the Court should preclude the testimony of plaintiff's expert, John Tobias, Ph.D.

## POINT III
## PLAINTIFF'S WARNINGS EXPERT SAM GLUCKSBERG SHOULD BE PRECLUDED FROM TESTIFYING

In his opposition papers, plaintiff claims that Sam Glucksberg is qualified to act as an expert in this matter because he has "extensive experience." As was set forth in defendants' moving papers, none of this experience involves warnings for electrical products utilized by mechanics in commercial automobile garages. Defendants concede that Glucksberg has a B.S. and Ph.D. in psychology. However, that alone does not qualify someone to opine as to the adequacy of warnings or the marketing of a product.

Plaintiff attempts to distract the Court from Glucksberg's lack of qualifications by focusing on his past unrelated experience and by misstating his qualifications. For example, plaintiff states in his opposition that Glucksberg worked for the Army for seven years as Chief of Supporting Research. However, upon reading Glucksberg's curriculum vitae it is apparent that he served for only three years as "Research Psychologist to Deputy Chief Supporting Research Laboratory." While serving in this capacity, Glucksberg was responsible for "the transmission of information" on various topics such as the safe handling of nerve gas, handling munitions, information and instructions on vigilance for monitoring radar screens, maintenance of main battle tank armored personnel carriers, the design of a rifle stock so that the kickback does not affect aim, and design of automobile symbols for people to use while operating

13

military vehicles. (See Glucksberg Dep. at 16:1- 17:3, Ex. I to Haworth Daubert Cert.) None of these items are related, in any fashion, to the sufficiency of warnings on electronic or automotive products.

Following his work in the Army, Glucksberg consulted with only two companies: Home and Roam Leisure Products (concerning warnings on above-ground pools) and Chilton Consulting, a company affiliated with the FDA. In his capacity with Chilton he evaluated whether the warnings were understandable. (See Glucksberg Dep. at 18:6-15, Ex. I to Haworth Daubert Cert.) Again, none of this experience is related to the product at issue in this litigation.

Finally, plaintiff attempts to bolster Glucksberg's credentials by pointing to numerous psychology articles he wrote and classes he taught as a professor. A reading of the lists of articles written clearly shows that none of these articles are related to warnings utilized on electronic equipment. Instead, the focus of these articles are various psychological topics such as strength of drive, rotary pursuit tracking, problem-solving, memory, verbal behavior, effects of incentive, sensory deprivation, and development of communication, just to name a few.

More importantly, plaintiff states, without any evidentiary support, that Glucksberg has been "qualified and testified as a warnings expert in Court over 40 times." What counsel does not mention is that Glucksberg has been disqualified as an expert in the case of Dennis v. Pertec Computer Corp., 927 F. Supp. 156 (D. N.J.

1996), aff'd 135 F.3d 764 (3d Cir. 1997) on the basis that the testimony to be provided was unreliable.  In Dennis, Glucksberg attempted to provide a similar opinion – that had the Defendants utilized proper and timely warnings the injuries caused by repetitive typing on a keyboard would have been reduced.  Id. at 159.

As for the reliability of Glucksberg's opinion, plaintiff glosses over the fact that Glucksberg did no investigation in order to understand and/or familiarize himself with the functions of a commercial garage.  Contrary to counsel's assertion, Glucksberg also admitted that he did nothing to familiarize himself with the hazards involved in a commercial auto garage.  Conversely, when he acted as a consultant for Home and Roam he familiarized himself with the hazards involved by consulting the Red Cross standards.  (See Glucksberg Dep. at 31:17-32:7, Ex. I to Haworth Daubert Cert.) Further, although he relies extensively on the NEC 511 and UL standards, Glucksberg admitted that he did not read any of them.  Glucksberg also failed to interview or speak with any mechanic to determine the training received by the average mechanic as well as the extent of a trained mechanic's specialized understanding of the workings of a commercial garage.  Instead, Glucksberg assumed all mechanics have the same lay understanding as himself and other non-mechanics.

In light of the foregoing, as well as for the reasons advanced in Defendants' moving papers, it is respectfully submitted that Sam Glucksberg, Ph.D.'s report and testimony be precluded.

15

Respectfully submitted,

_____

Scott Haworth (SH 5890)
Barry L. Gerstman (BG 3691)
HAWORTH COLEMAN & GERSTMAN,
LLC
45 Broadway, 21st Floor
New York, New York 10006
Telephone: (212) 952-1100
Attorneys for Defendant Voltec Industries,
LLC


*/s/ John Maucher* _____
John Maucher (JM 7892)
MINTZER, SAROWITZ, ZERIS, LEDVA
& MEYERS, LLP
2070 Springdale Rd., Suite 400
Cherry Hill, NJ 08003
Telephone: (856) 616-0700
Attorneys for defendants Carquest Corp.,
Carquest Products, Inc. and BWP
Distributors, Inc.


*/s/ Nicole Strauss-Russo* _____
Nicole Strauss-Russo (NLS 1931)
LITCHFIELD CAVO LLP
An Illinois Limited Liability Partnership
1800 Chapel Avenue West, Suite 360
Cherry Hill, New Jersey 08002

16

Telephone: (856) 854-3636
Attorneys for Defendants, Tasco and TMC
Enterprises