UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(NEWARK VICINAGE)

------------------------------------------------------------------x
JEAN MICHEL MECHIN,

        Plaintiff,                                    Civil Action No.:  07-5824 (SDW)(ES)

     -against-

CARQUEST CORPORATION; CARQUEST
PRODUCTS, INC.; TMC ENTERPRISES; VOLTEC
INDUSTRIES; TASCO; BWP DISTRIBUTORS,
INC.; and ABC CORPORATIONS 1-10 (said names
presently unknown and fictitious),

        Defendants.
------------------------------------------------------------------x


**DEFENDANT VOLTEC INDUSTRIES, LLC'S REPLY BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

                                                                  HAWORTH COLEMAN & GERSTMAN,
                                                                  LLC
                                                                  45 Broadway, 21st Floor
                                                                  New York, New York 10006
                                                                  (212) 952-1103
                                                                  Attorneys for Defendant
                                                                   VOLTEC INDUSTRIES, LLC

On the Brief:

Scott Haworth, Esq.
Barry L. Gerstman, Esq.

# **TABLE OF CONTENTS**

ARGUMENT ............................................................................................................................. 1

POINT I

VOLTEC IS AN INNOCENT SELLER UNDER N.J.S.A. 2A:58C-9 ....................................... 1

    i.   No Dispute As To Identity of Manufacturer...................................................... 1

    ii.  TMC Electrical Has a Presence in The United States and is Not Judgment Proof ........... 2

    iii. Voltec Did Not Exercise Significant Control Over The Sale or Marketing of the Trouble Light to Denville Firestone ................................................................................. 3

POINT II

DESIGN DEFECT................................................................................................................... 4

    i.   Plaintiff's Misrepresentation of Expert Testimony Does Not Provide a Basis to Deny Summary Judgment on Design Defect ............................................................... 4

    ii.  Voltec Did Not Play a Significant Role in Marketing or Selling the Trouble Light to Denville Firestone................................................................................................. 7

    iii. Plaintiff Has Not Provided Proof of a Safe, Reasonable Alternative Design.................... 9

        a.  Explosion-Proof Drop Lights........................................................................ 9

        b.  Portable Flashlights................................................................................... 11

        c.  Fluorescent Drop Lights............................................................................ 11

POINT III

FAILURE TO WARN ............................................................................................................. 12

POINT IV

PROXIMATE CAUSATION ................................................................................................... 13

CONCLUSION........................................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

Meyer v. Bd. of Ed., Middletown Twp., 9 N.J. 46, 86 A.2d 761 (1952) ....................................... 15

**Regulations**

NEC 511 ................................................................................................................................ 6, 12
NFPA 921 ............................................................................................................................ 13, 14

# ARGUMENT
## POINT I
### VOLTEC IS AN INNOCENT SELLER UNDER N.J.S.A. 2A:58C-9

Plaintiff argues that Voltec's summary judgment motion based on the innocent seller defense should be denied because 1) Voltec did not file the requisite affidavit; 2) TMC Electrical allegedly lacks a United States presence or assets to satisfy a judgment; and 3) Voltec exercised significant control over the marketing and selling the product to Firestone.  There is no merit to these claims.

### i.      No dispute as to identity of manufacturer.

First, there is no basis for plaintiff's claim that Voltec cannot raise the innocent seller defense because it "never filed the requisite affidavit."  (See Plt. Mem. at  2.)  An affidavit is not necessary because there is absolutely no dispute over the light's distribution chain or that it was manufactured by TMC Electrical Products (Shenzhen) Co., Ltd.  Plaintiff, in paragraph 13 of his Local Rule 56.1 Statement in support of summary judgment, sets out the distribution chain:

> The Carquest Trouble Light involved in this incident was ordered by CPI from Voltec. (Miller Dep. at 57:15-58:5.) **Voltec then placed the order with Tasco d/b/a TMC Enterprises who had the light manufactured in China**. (Id.) The Carquest Trouble Light was imported by Tasco d/b/a TMC Enterprises, and sold it to Voltec, who in turn sold the light to Carquest. (Id.) (See Plt. Local Rule 56.1 Statement.)

This is also not a situation where plaintiff was not made aware of the identity of the manufacturer until after discovery had ended.  In sworn testimony given on February 7, 2010, months before the discovery end date, Thomas Miller of TMC Enterprises

1

clearly identified the name of the manufacturer as TMC Electrical.  (See Miller Dep. at 54:22-55:7; 57:15-18, Ex. G to Haworth SJ Cert.)  The name of the manufacturer is also listed in the UL application.  (See Ex. A to Haworth Reply Cert.)  Had plaintiff wanted to sue TMC Electrical, he clearly had the time and knowledge to do so.

### ii.     TMC Electrical has a presence in the United States and is not judgment proof.

There is no basis for plaintiff's claim that TMC Electrical does not have a presence in the United States.  It clearly did via its use of TMC Enterprises as an agent for U.S. sales and UL approval.  On TMC Electrical's website, under Company Information, it states:

> TMC Electrical Products (Shenzhen) Co., Ltd…is a branch of TMC Enterprises Group who is located at Los Angeles, USA. (See http://tmc-electrical.com/cn/CompanyInfo.asp., Ex. B to Haworth Reply Cert.)

The section of its website for office locations lists the company's headquarters as "TMC Enterprises – USA, Chino, California."  (See Ex. B. to Haworth Reply Cert.)  Further, John Wray of Voltec testified that Voltec purchased the light through TMC Enterprises which acted as TMC Electrical's sales liaison in the United States:

> Q. What does TMC Enterprises do?
> A. They are also a, TMC Enterprises is also a marketing company, and they are the liaison, manufacturing liaison between Voltec. (See Wray Dep. at 22:3-8, Ex. E to Haworth SJ Cert.)

Mr. Miller of TMC Enterprises also testified "we would act as a conduit or as an agent for the factory to help get their product in. So it was really our office was just a conduit." (See Miller Dep. at 71:16-72:13, Ex. G to Haworth SJ Cert.)

2

As to assets, there is no evidence that TMC Electrical is bankrupt or otherwise judgment proof. Based on its website, it owns a factory in China and, based on its continuing sales to Carquest and other retailers in the United States, it has revenue.

The whole premise for plaintiff's opposition to Voltec's motion based on the innocent seller defense is lacking because he wrongfully relies on representations made by a non-lawyer, Mr. Miller, concerning the corporate presence of TMC Electrical, a company that Mr. Miller does not own. (See Miller Dep. at 14:24-15:4, Ex. G to Haworth SJ Cert.) While TMC Enterprises did act as TMC Electrical's agent for sales and UL approval in the United States, plaintiff mistakenly equates that relationship with meaning that Mr. Miller has the knowledge and authority to offer statements about TMC Electrical's corporate status in the United States. There is no legal basis for such reliance. Moreover, plaintiff misrepresents Mr. Miller's testimony. The testimony cited by plaintiff, Miller Dep. at 71:16-72:13, does not support his claim that TMC Electrical has no presence in the United States. Rather, it relates to TMC Enterprises acting as TMC Electrical's "conduit or agent" with UL to "help get [TMC Electrical's] products in" to the United States. As set forth above, TMC Electrical's use of a United States based agent only supports Voltec's position that TMC Electrical has a "presence" in this country.

### iii. Voltec did not exercise significant control over the sale or marketing of the Trouble Light to Denville Firestone.

Plaintiff's catchall argument is that *each* defendant exercised some significant control over the marketing and sale of the product to Firestone. However, he only details TMC Enterprises' role in obtaining UL approval and Carquest's role in marketing and selling the product to commercial automotive garages and, in particular, Denville Firestone. Plaintiff fails to state, because the record contains no such evidence, how Voltec exercised "significant control" over the marketing or sale of the product to commercial automotive garages. The uncontested evidence in fact shows that Voltec played no role in the design of the product or its UL registration, no role in the content or placement of its warnings and no role in marketing the product to Carquest's customer base, including Denville Firestone. (See Wray Dep., 61:17-22; 71:20-72:10; 79:9-20, Ex. E and Miller Dep., 57:25-58:8, Ex. G. to Haworth SJ Cert.)

Accordingly, there is simply no basis upon which to deny Voltec summary judgment based upon its status as an innocent seller.

## POINT II
## DESIGN DEFECT

**i. Plaintiff's misrepresentation of expert testimony does not provide a basis to deny summary judgment on design defect.**

Plaintiff argues that Voltec's summary judgment motion as to design defect should be denied because Voltec allegedly ignores "the testimony of [its] expert witnesses who each admit that the product was not safe for use in commercial automotive repair garages such as the Firestone facility where the accident occurred."

(See Plt. Mem. p. 9.) Plaintiff blatantly misrepresents the testimony of Voltec's cause and origin expert Donald J. Hoffmann, Ph.D, P.E., C.F.I.

Hoffmann never testified that the light was not suitable for use in any commercial automotive garage. What he said was that it should not have been used by Denville Firestone in an *area of the garage* not designed or equipped for fuel transfer work. Hoffmann's point is that the basic design of the shop, e.g. its lack of ventilation to remove flammable vapors, the presence of multiple unrated electrical equipment and the location of permanent electrical outlets less than 18 inches from the floor, precluded the safe performance of fuel repair work in that particular facility:

> Q. Okay. Now can you answer my question? My simple question was, is there a part of the garage at the Denville Firestone where it would have been appropriate to use the Carquest trouble light?
>
> A. **As long as they weren't transferring flammable liquids like they were not supposed to, it would be fine to use anywhere in this garage.** (See Hoffmann Dep. at 55:11-17, Ex. BB to Haworth SJ Cert.)
>
> Q. Okay. So, it's your opinion that it was appropriate to have the Carquest trouble light in use even though that there was fuel tank repairs and handling of volatiles at the Denville Firestone; is that correct?
>
> A. No. No. No. No. No. No. No. It's not, the Firestone facility is not properly designed to do the work that they were doing, period. They can't do that work [fuel transfer work] in that facility. If they don't do that work in that facility, all the electrical and everything they had in there is fine. It's all fine. **If they do that work in that facility, then you have to change everything. The design and the specification and the equipment within that facility is completely wrong**. (See Hoffmann Dep. at 58:4-21)

5

Hoffmann also testified that you could use the light in segregated areas of a major repair garage where no fuel transfer work is performed or in a minor repair garage, as defined by NEC 511.  Work involving the transfer of fuel is simply not performed in such settings.  (See Id. at 66-68)

Plaintiff's opposition misses the point because he fails to address that there are several categories of commercial automotive garages where a non-hazardous location rated light such as the Carquest product at issue can be safely used.  He conveniently ignores the testimony of his own cause and origin expert, Robert Malanga, P.E.  Malanga testified that the light *is* suitable for use in a wide variety of commercial garage settings including 1) a minor repair garage where fuel is not handled (e.g. an oil change, tune-up, lubrication, routine maintenance or tire rotation shop); 2) the service area of a major repair garage where fuel is handled but where the service area has been specifically designed with ventilation to remove flammable vapors; and 3) the non-classified areas of a major repair garage such as the stock rooms, waiting rooms or parts rooms where fuel is not handled.  Malanga testified:

> Q. Would it be appropriate for Denville to have used this drop light outside the service area?
>
> A. If they wanted to use the drop light in, say, the sales area or the waiting room, that's a non-classified area. It's a portion of a repair facility. So, you could consider that that would not disobey any laws or guidelines.
>
> Q. A location such as the service area of Denville Firestone, if it had proper ventilation, could non-classified electrical equipment have been used within the service area without violating any codes?

6

> A. If you remove the hazard through various maintenance, one of which could be ventilation, and thus, render that a non-classified area, then you could use an unclassified device in that area. (See Malanga Dep. at 129:4-24, Ex. J to Haworth SJ Cert.)
>
> Q. Understood. With that clarification, for a minor repair garage, as long as they meet that definition of the floor area, there is no pits, there is no area where fumes could collect, and in that handling flammable liquids, then unclassified electrical devices can be used throughout that service area. Correct?
>
> A. There may be sub areas where you have a hazardous locations, like, maybe a parts washer or something like that. But, in general, subsection D-1, this part of the NEC allows you to use unclassified equipment in what they're considering an unclassified area.
>
> Q. Minor repair garage in the real world, are those, like, those quick change oil shops? Is that what it's meant to cover?
>
> A. That's one of them.
>
> Q. Okay.
>
> A. If you look at 511.2, it gives you the specific definition. You could do tune-ups, fluid changes, brakes, air conditioning, tire rotation, routine maintenance work, similar. (See Malanga Dep., p. 132:21 – 133:19.)

Contrary to plaintiff's oft-repeated statement, the testimony simply does not support plaintiff's claim that all experts agree the product was not suitable for use in **any** commercial automotive setting. This is simply false, as confirmed by plaintiff's own expert's sworn deposition testimony.

### ii. **Voltec did not play a significant role in marketing or selling the product to Denville Firestone.**

7

Plaintiff argues that summary judgment should be denied based on the false claim that Voltec "purposely marketed the light to Firestone and other commercial garages." (See Plt. Mem. at 10.) In support, he relies on testimony concerning TMC Enterprises' role in obtaining UL approval and Carquest's role in marketing and selling the product to Denville Firestone. He fails to address testimony from Voltec's witness concerning its lack of involvement:

> Q. Did you have any understanding where Carquest was going to market the product?
>
> A. No.
>
> Q. Other than the fact that you knew that it was going to be used for, primarily for automotive repair, correct?
>
> A. It would be primarily sold through Carquest Auto Parts stores and whatever their customer base dictates. **It could be a homeowner, it would be a professional installer, it could be a mechanic, it could be a shop. You know, they cover a lot of spectrum there.** (See Wray Dep. at 76:2-14, Ex. E. to Haworth SJ Cert.)
>
> Q. You don't get involved in any of the marketing or sales of the lights to the end-user?
>
> A. No.
>
> Q. You don't get involved in any of the literature that goes with, the marketing literature or advertisement that goes with the product?
>
> A. No.
>
> Q. And you don't have any interaction with the end-user?
>
> A. No. (See Wray Dep. at 79:9-20)

As to the "Professional-Duty" language, which plaintiff mistakenly claims misrepresents the light's proper use, it was not created by Voltec as evidenced by Carquest's use of the phrase in 2001 *before* it began doing business with Voltec. (See Carquest 2001 and 2004 Service Line Catalog Catalogs, Ex. F to Haworth SJ Cert.) Therefore, the use of the "Professional Duty" marketing phrase, even if misleading as plaintiff's claims, provides no basis for liability against Voltec.

### iii. Plaintiff has not provided proof of a safe, reasonable alternative design.

Plaintiff also argues that summary judgment should be denied as to design defect because he has presented proof of a reasonable, safe, alternative design to general use, incandescent drop lights on a reel such as the subject light. However, plaintiff's claimed reasonable, safe, alternative designs, i.e. a $3,000 to $4,000 explosion proof drop light on a reel or an underpowered, portable, battery-operated flashlight or a general use, fluorescent drop light, differ in cost, function and utility from incandescent drop lights.

### a.   Explosion-Proof Drop Lights

Plaintiff's claim that an explosion proof drop light is a "reasonable" alternative to an incandescent drop light is absurd. An explosion proof drop light on a reel costs $3,000-$4,000 while an incandescent drop light on a reel costs between $15 and $90. (See Gambardella Aff., ¶ 26, Ex. H; Tobias Dep. at 104:8-14, Ex. I; and Malanga Dep. at 118:15-16, Ex. J to Haworth SJ Cert.) The two products are not even remotely

9

comparable in cost. It would likely cost tens of thousands of dollars for a commercial automotive garage to exclusively use explosion-proof drop lights in its service area. According to plaintiff, this cost would have to be incurred whether or not the commercial automotive garage performed repairs involving the transfer of fuel and whether or not the shop intended to use the light in the service area. Clearly, this idea is not reasonable. Nor is it in accord with the governing regulations. Further, the ease of use of the two products is not the same. An explosion proof drop light is heavier by a pound or two than an incandescent drop light making it more difficult to use in the context of an auto garage. (See Malanga Dep. at 118:23-119:9, Ex. J to Haworth SJ Cert.)

Rather than submit expert proof on alternative design, as required under the NJPLA, plaintiff again relies on misquoting and misrepresenting the testimony of Voltec's expert Dr. Hoffmann to make the fallacious argument that Dr. Hoffmann conceded "that an explosion-proof light would be a reasonable, safe, alternative design…" (See Plt. Mem., p. 13.) **Dr. Hoffman did not say that**. His testimony:

> Q. Would it be appropriate to have an explosion proof light at the Denville Firestone in conjunction with fuel transfers and major repairs?
>
> A. It's not appropriate for them to do major repairs in that facility. It would be appropriate to have a rated light and have equipment appropriate for that classification if the entire facility was properly rated and maintained and the procedures were properly done. **But, just to put a rated class one, division one light in that facility, no, it's inappropriate.** That facility is inappropriate for doing the procedures that they were doing. (See Hoffmann Dep. at 74:6-18 at Ex. BB to Haworth SJ Cert.)

10

### b.    Portable flashlights

Plaintiff has also made no showing that a portable, battery-operated flashlight is an adequate substitute for the convenience and illumination of a hard-wired, incandescent drop light on a reel. Notably, Voltec's automotive expert, Bruce Gambardella, P.E., opined:

> The incandescent drop light provides more intense focal light which can be directed at an object of interest while shading the operator from the light source. Clearly, it is important for mechanics to be able see what they are doing. Incandescent drop lights have been used for this purpose for many years. (Gambardella Aff., ¶ 24, Ex. H to Haworth SJ Cert.)

### c. Fluorescent Drop Lights

As to plaintiff's third alternative design, a fluorescent drop light, this type of product is not classified as safe for use in a hazardous location where fuel is being handled. (See Gambardella Aff., ¶ 25 at Ex. H; Malanga Dep. at 113:18-114:12, Ex. J to Haworth SJ Cert.) As such, it presents a similar risk of fire when exposed to flammable vapors as an incandescent light. Notably, Voltec distributed fluorescent drop lights to Carquest, fluorescent drop lights were available for sale in Carquest's catalog and Firestone could easily have purchased a fluorescent drop light had it so desired. (See Carquest's 2001 and 2004 Service Line Catalog, Ex. F to Haworth SJ Cert.)

Plaintiff's assertion that Voltec is suggesting that mechanics work in the dark is absurd. Voltec is merely suggesting that, if Firestone intended repairs involving the

transfer of fuel to be performed at its Denville location, it had the responsibility to design and equip the shop, including its electrical equipment and lights, to safely perform that work. This obligation is imposed upon Firestone by OSHA – not Voltec. Firestone's failure to do so does not create a design defect case against Voltec.

Based on the foregoing, Voltec's motion for summary judgment on design defect should be granted.

### POINT III
### FAILURE TO WARN

Plaintiff's opposition fails to set forth an alternative warnings scheme for the Trouble Light that would have done a better job of communicating the risks of the product than its existing warnings. The Trouble Light came with express warnings addressing the very fire risk complained of by plaintiff:

- DO NOT USE IN THE PROXIMITY OF VEHICLES OR EQUIPMENT, WHEN THERE IS RISK OF FLAMMABLE LIQUIDS COMING INTO CONTACT WITH THE HANDLAMP

- DO NOT USE IN HAZARDOUS LOCATIONS AS REQUIRED BY… PART I OR THE UNITED STATES N.E.C. ARTICLE 511[1]. (See Exs. N and O)

In opposition, plaintiff argues that his experts found the warnings to be "ambiguous and deficient." (See Plt. Mem. at 16.) However, plaintiff's expert Malanga testified that the warnings were "straightforward" and "in plain English." (See Malanga Dep., p. 123:18-124:18 at Ex. J to Haworth SJ Cert.) Plaintiff also notes the unsupported warnings scheme of his experts, John Tobias, Ph.D. and Sam

---

[1] NEC 511 defines hazardous locations in commercial automotive garages and where non-classified electrical products can be used.

12

Glucksberg, Ph.D., whose sole suggestion is to replace or add to -- Glucksberg is still not sure -- the product's existing warnings a statement "Not for use in commercial automotive garages." This is nonsensical. Plaintiff's own experts concede that there are in fact commercial garages – minor repair garages or areas of major repair garages where repairs requiring the transfer of fuel are not performed – where use of the subject light would be appropriate.

Lastly, Voltec respectfully refers the Court to its pending motion to preclude plaintiff's experts as further evidence of the unreliability of plaintiff's experts' opinions as to warnings.

Accordingly, plaintiff's failure to warn theory is properly dismissed as to Voltec as a matter of law.

## POINT IV
## PROXIMATE CAUSATION

Voltec's motion for summary judgment regarding proximate causation should be granted because there were multiple competent ignition sources in the area of the flammable vapors at the time of the fire, none of which have been reliably ruled out. (See Hoffmann Affidavit at ¶ 2, Ex. K; Hoffmann Dep. at 30:2-31:7, Ex BB to Haworth SJ Cert.)

Experts on behalf of both the plaintiff and the defendants agree that NFPA 921 is the standard for fire and explosion investigations. (See Malanga Dep. at 64:2-9, Ex. J to Haworth SJ Cert.) NFPA 921 provides that if there are equally "possible" ignition

13

sources for a fire but no "probable" cause, the cause of the fire must be declared "undetermined." Plaintiff – with no reliable basis – continually repeats the mantra that all alternative competent ignition sources that conflict with his theory have been ruled out. This is a violation of proper methodology under NFPA 921. Plaintiff's expert Malanga in fact testified that, under NFPA 921, it is not proper to "discard something because you don't like what they said." (See Malanga Dep. at 65:16-66:9.)

Further, two key pieces of evidence for determining the drop light's possible involvement as an ignition source, i.e. the drop light and the bulb's filament, were not preserved for inspection. Examination of the filament would have likely allowed the experts to determine whether it was turned on at the time of the fire and whether the filament played any role in starting the fire. (See Malanga Dep. at 195:22-196:9, Ex. J to Haworth SJ Cert.) The loss of this evidence further precludes a definitive finding that the bulb filament caused the fire.

Plaintiff's opposition on proximate causation is lacking because it is based on cherry-picked evidence and the incomplete investigation of the official agencies. (See Voltec's Local Rule 56.1 Statement, ¶ 15-27 and Voltec's summary judgment opposition, p. 16-20.) However, the one key fact on causation that remains uncontested, among both plaintiff and defense experts, is that the fuel spill was caused by Firestone's failure to design and equip its shop to safely handle repairs involving the transfer of fuel as well as Mr. McWalters' multiple violations of good and accepted practices involving use of the Ford Service Manual and safe fuel handling

14

techniques.  (See Hoffmann Dep. at 29:4-30:1, Ex. BB; Malanga Dep. at 78:19-80:23; 102:24-103:4; 105:2-10; 106:8-12; 108:9-16, Ex. J; Gambardella Aff., ¶ 5-23, Ex. H to Haworth SJ Cert.)  Voltec's automotive expert, C. Bruce Gambardella, P.E., best summed up his opinion of McWalters' actions: "[t]his is nuts" and "I question the man's perhaps sanity…I guess I'm speechless with how imprudent this is."  (See Gambardella Dep. at 46:8-47:6, Ex. G to Haworth SJ Opp Cert.)  Thus, even assuming *arguendo* that the falling fuel tank struck the light, resulting in ignition of flammable vapors from the fuel spill, the jury could also conclude that Firestone's conduct was an intervening cause that "destroys the causal connection between the negligent act of the defendant and the wrongful injury…, in which case damages are not recoverable because the original wrongful act is not the proximate cause."  Meyer v. Bd. of Ed., Middletown Twp., 9 N.J. 46, 54, 86 A.2d 761, 765 (1952).

Based on the foregoing, summary judgment should be granted in favor of Voltec on proximate causation.

## CONCLUSION

Voltec is entitled to summary judgment based upon its status as an innocent seller.  Even if Voltec were not entitled to summary judgment on this basis, each theory of liability asserted against Voltec is properly dismissed as a matter of law.

_[signature]_

Scott Haworth (SH 5890)
Barry L. Gerstman (BG 3691)
HAWORTH COLEMAN & GERSTMAN, LLC
45 Broadway, 21st Floor
New York, New York 10006
Telephone: (212) 952-1100
Attorneys for Defendant Voltec Industries, LLC

16